The People of the State of New York, Respondent, *v.* Frank Rossi, Appellant.

Third Department, May 8, 1946.

*Leary, Fullerton & Neddo,* attorneys (*Walter A. Fullerton* and *James A. Leary* of counsel), for appellant.

*William M. Nicoll, District Attorney* (*Adam Ogonowski, Assistant District Attorney,* of counsel), for respondent.

FOSTER, J.  On the 11th of August, 1944, the body of a man was found in the Mohawk River in the town of Niskayuna, Schenectady County, N. Y.  Subsequently it was identified as the body of Edward Reali, a newspaper vendor and " numbers agent ", who had resided in the city of Schenectady, N. Y., and who had been missing for three days.  An examination revealed that his skull was fractured in three places, two depressed fractures just back of and behind the ears, and a connecting linear fracture.  His clothes had apparently been rifled.  These, and other circumstances, led the authorities to the conclusion that he was a victum of an assault.

The appellant, Frank Rossi, had been seen in company with Reali during the early morning hours of August 9th.  He was questioned by the police, first at the police station in the city of Schenectady, and later at a substation of the State troopers at Duanesburg, some ten or twelve miles from the city.  At first he maintained that he went home on the night of August 8th at eleven o'clock, after returning in his car from a trip to Johnstown with one Pasquale Nicolella.  When the latter was questioned he contradicted Rossi and said that Rossi did not take him home until one-forty A.M. on the morning of August 9th.

Apparently information also came to the police that Rossi was also with one Damon Stendor during the early morning hours of August 9th.  Stendor was apprehended at Schenectady

and taken to Duanesburg. On the way out there he was told by one of the troopers that Rossi had charged him with the killing of Reali. Stendor made an angry comment, and then stated that he and Rossi had killed Reali on the early morning of August 9th, robbed him and threw his body into the Mohawk River. Later, at Duanesburg, Stendor signed a written confession. Rossi, it is claimed, made several oral confessions but refused to sign a written one. A written statement was dictated by the assistant district attorney, embodying the oral admissions of Rossi, and shown to him, and it is said that he read the same and admitted it to be true. Nevertheless he would not sign it. Later this written but unsigned statement was admitted in evidence against him.

The tenor and substance of both statements were much the same and the facts recited are briefly these. Rossi and Stendor met Reali during the early morning of August 9th. They both knew him and believed that he carried a considerable sum of money on his person as a " numbers agent ". They agreed between themselves to take him in Rossi's car to a lonely spot outside the city adjacent to the river and kill him in order to get the money they thought he had on his person. Rossi was to drive the car with Reali next to him on the front seat. Stendor was to sit on the back seat, and at a signal from Rossi was to hit Reali on the head with a hammer. According to the statements, however, Reali became suspicious and left the car at the scene of the crime, and started back on foot. Rossi ran after him, caught him and held him while Stendor hit him on the head with a hammer, and later with an automobile crank handle. After they had gone through Reali's pockets his body was thrown in the river. Rossi and Stendor then returned to the latter's room in Schenectady where Stendor changed his shirt because it had bloodstains on it, and gave Rossi a shirt and a pair of trousers to replace his which had become wet. There they also divided the proceeds of the crime, some $249. It should be noted here that Rossi's alleged oral confessions were in many instances contradictory of the written statement which it is claimed he admitted to be true.

Rossi and Stendor were jointly indicted for the crime of murder in the first degree on two counts, one a charge of murder committed with premeditation and deliberation, and the other a charge of killing while engaged in the commission of a felony. Both moved for separate trials and their motions were denied. On the trial Stendor testified in his own behalf. Rossi did not testify. On the stand Stendor repudiated much of his written confession, and swore that Rossi was not present when

Reali was killed; that he borrowed Rossi's car after taking the latter home; that Reali was killed during the course of a struggle, and that Rossi was not present and had nothing to do with it. After Reali was dead he threw his body into the river. He also testified that on the same morning, and after Reali had been killed, he told Rossi about the occurrence, showed him the place where it happened, and warned him not to say anything about it. He also gave him some money for the use of the car. He explained that he implicated Rossi in his written confession because he thought Rossi had acted as an informer against him.

Despite Stendor's testimony exonerating Rossi both defendants were convicted of murder in the second degree. Rossi alone has appealed.

Stendor's testimony that he and Reali were alone at the time of the killing was corroborated to some extent by the testimony of the witness Jacqueline Mulvaney, who, with her brother, was somewhere in the vicinity where the homicide took place. She testified that she saw only two men in the car when it passed her, apparently on its way to the scene of the crime. She also said that the car became stuck in a rut and she saw Stendor outside of it, standing on one of the running boards for a time. Stendor himself admitted the car became stuck in a rut and that he saw a girl when he was outside of the car trying to get it dislodged. He also claimed that while he was doing this Reali was behind the wheel of the car.

The essential facts of the case against Rossi which the jury might find from the testimony may be roughly summarized as follows. He confessed orally to the crime with particularity and in considerable detail, and admitted that the written statement dictated by the Assistant District Attorney was true. He lied about going to bed at eleven o'clock on the evening of August 8th. He was seen in an automobile in the city of Schenectady on the morning of the crime between twenty minutes to five and five o'clock, and Reali was then in the front seat of the car with him. A shirt found between two trees out in the country was identified by Nicolella as a sport shirt worn by Rossi on the night of August 8th. This shirt was not the shirt Stendor wore according to the witness Jacqueline Mulvaney. Reali did not drive a car and the inference may be drawn that Rossi was driving the car when Stendor was standing on the running board as the car moved out of a rut, as testified to by Jacqueline Mulvaney.

The contrary case for Rossi on the facts which the jury might find may be roughly abbreviated as follows. Although chrono-

logically his age was nineteen years, his mental age was sub-normal, with a possible maximum of ten years and six months and a possible minimum of eight years. The proof is strong that he was and is an epileptic, and the inference could easily be drawn that he was susceptible to suggestions and lacked a normal capacity to understand the complete purport and signifi-cance of his alleged confession. His apparent knowledge of detail concerning the crime may be accounted for by the fact Stendor testified he told Rossi all about it and pointed out the places. Stendor testified that Rossi had nothing to do with the crime, and that he was alone with Reali when the latter was killed after a struggle. No reason or motive was shown for Stendor to take the onus of the killing entirely on himself. Jacqueline Mulvaney testified that she saw only two men in the car when it passed her on the way to the scene of the crime. She also testified that when the car was apparently stuck in a rut she saw Stendor outside of it, and afterwards saw him standing on the running board. Stendor testified that when he was trying to get the car out of a rut Reali was behind the wheel. The People's proof that Reali did not drive a car was not so strong as to preclude the possibility that he may not have undertaken in an emergency to drive the car for a short distance. It rather strains credulity to believe that Nicolella could identify a shirt found between the trees as the particular shirt that Rossi wore on the night of August 8th. He might have identified the color or style but to identify a specific shirt he must have possessed extraordinary powers of observation and recollection. Nicolella was a parolee and presumably anxious to keep on good terms with the police. The mother of Rossi said that the shirt found between the trees was not his, and produced one that was somewhat similar. She also testified that Rossi was in bed at home at ten minutes to seven the morn-ing of the crime, and went to work with his father that morning. If her testimony was true Rossi could not have been at the scene of the crime when the killing occurred.

While these contrasting summaries deal with issues of fact, exclusively for a jury to accept or reject, they nevertheless indicate at least a measure of uncertainty as to Rossi's partici-pation in the homicide. Whether such uncertainty amounts to a reasonable doubt we do not undertake to say. That ques-tion is for a jury. However, appellant was entitled beyond cavil to have this issue presented clearly on a trial that was not beclouded by hearsay testimony to such an extent as to obscure a reasonable doubt in his case, if one in fact existed. We can-not say that the record before us meets this test. It is replete

with statements made by Stendor, and even acts performed by him in the presence of officers, which were received in evidence only against him and were hearsay as against Rossi. It is true that the court ruled in each instance that such testimony was admissible only against Stendor, and perhaps if there were only a few isolated instances such a ruling would have been sufficient to guide the consideration of the jury. But the instances were so many and varied that after an intensive study of the record we are unable to separate and limit clearly in our own minds the testimony inadmissible against Rossi from that which was properly admissible against him without a line by line reference to the record. We think it obvious that the jury could not possibly have limited their consideration of his case only to the evidence properly admitted against him. It was inevitable that they would view the record as a whole, and this under the circumstances was highly prejudicial to Rossi.

We are cognizant of the rule that merely because two defendants have confessed the trial court is not bound to grant separate trials (*People* v. *Doran*, 246 N. Y. 409). But this rule must be applied with caution, and in any event the course of the trial involved here went far beyond the fair application of the rule. We are not bound by the exercise of the trial court's discretion in denying a separate trial simply because on the facts before him he was justified in his denial. He was acting prospectively and his action in that regard is not to be considered final. We may and should consider the matter in the light of the subsequent course of the trial (*People* v. *Snyder*, 246 N. Y. 491, 497; *People* v. *Fisher*, 249 N. Y. 419, 427). Viewed in retrospect we think the failure to give the appellant Rossi a separate trial was prejudicial to such an extent that the judgment of conviction against him must be reversed.

Another incident which we think was prejudicial to appellant occurred at the conclusion of the court's charge. Counsel for appellant made the following request: " I ask Your Honor to charge, without reflection upon the character of the assistant district attorney, Adam Ogonowski, that his testimony should be weighed in consideration of his position and calling and his official relation to the case." The court declined to so charge. We think this was a perfectly proper request and it was error to refuse it. We have no doubt that the Assistant District Attorney is a sincere and able public official, but our view of his character is of no moment in dealing with his role as a witness. When an attorney abandons the role of an advocate and assumes the role of a witness he should be treated like any other witness. There can be no question but that the Assistant District Attor-

ney was an interested witness in the case. The major part of its preparation had evidently been in his hands, and he not only supervised the preparation of the written but unsigned statement introduced in evidence against Rossi, but he testified at considerable length concerning this alleged confession. The jury were quite apt to be inclined in any event to give great weight to his testimony as a public official, and the refusal of the court to charge as requested practically placed a seal of verity on his evidence. It is needless to add that this was highly prejudicial to the appellant.

The charge of the trial court was brief, considering the amount of testimony taken, and devoted in its entirety to principles and rules of law. No reference was made to any decisive issues of fact for the guidance of the jury in their deliberations. We do not mean to imply that this was necessarily erroneous, or that the trial court was bound to deal with the facts in extenso, but in two instances at least more elaboration was called for. In view of appellant's conceded low mentality the court should not have limited the issue of mentality merely to the question of whether he knew right from wrong, but also should have placed before the jury the question of whether he fully comprehended the nature and purport of his alleged confession as dictated by the assistant district attorney. Also the jury should have been instructed that they might consider all of the circumstances surrounding the delay in arraignment in determining the truth of appellant's confession, not merely whether it was voluntary (*People* v. *Elmore*, 277 N. Y. 397, 404). Such a charge was particularly called for in view of appellant's mentality, and the fact that he was taken in custody and kept incommunicado for the greater part of August 12th, before he was arraigned.

There are other points raised by appellant but since we have already concluded that the judgment of conviction should be reversed we do not feel it necessary to discuss them. We may say, however, that in our opinion, the direct examination of the People's expert witness, Lichtenstein, was permitted beyond proper limits over the objection of appellant's counsel. Also, the point that appellant, because of the youthful offender law (Code Crim. Pro., §§ 913-e—913-r), could not be found guilty of a felony murder we regard as without merit.

The judgment of conviction should be reversed and a new trial directed.

All concur.

Judgment of conviction reversed and a new trial directed.