THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, *v.* OCTAVE O. GUNTHER, Defendant.

City Magistrate's Court of New York, Borough of Manhattan, Mid-Manhattan Summons Part, December 7, 1948.

*Alfred H. Adler* for defendant.

*Julius L. Goldstein* for Herman Oppenheim, complainant.

BRENNER, M.  This hearing involves a charge of criminal libel under sections 1340 to 1344 of the Penal Law of New York. The question is whether sufficient evidence has been established to hold the defendant for having wrongfully and unjustifiably portrayed the complainant as a communist and thus exposed his person in the manner defined and prohibited by those penal sections of the statute.

The complainant, an American citizen, is a former Austrian public official, prominent in Austrian circles both abroad and in the country, who had suffered much under Hitler prior to his escape.  He was one of the organizers and a member of the board of directors of the " Austro American Council ", hereinafter referred to as the " Council ".

The defendant is the publisher of a newspaper, in the German language, known as the " Austria ", circulated among persons of Austrian origin.  This newspaper is opposed to communism.

On July 25, 1948, defendant published an article in the *Austria,* the portion offensive to the complainant, as translated, being as follows:

" * * * Warning!  Members of subversive organizations may lose their United States citizenship.

" During this coming fall, such vitally needed legislation as the Mundt-Nixon Bill or other propositions directed against elements unfriendly to the government of the United States will go into effect.  According to these, all persons who are members of subversive organizations are subject to loss of their American citizenship.  According to these laws, such elements will be expatriated, considered as enemies of the State, and ' shall be treated as such '.

"We believe ourselves to be dealing in a proper manner when, without making assertions of any nature ourselves, we warn our readers against maintaining any sort of contact with the two so called Austrian organizations to be listed below. We mean the Austrian organization and the newspaper which formed a merger in January 1948 and which work together with the youth group: Austro American Council and Austro American Tribune. Whether these two as well as the Youth Group Fellowship Club are to be considered as communist or subversive, we leave to our readers to decide. Let them judge whether an organization and a paper, each having at least two members of the Board of Directors who have been put behind bars in connection with the *Gerhardt Eisler* case, are to be considered American or Anti-American.

"Those people who have their doubts as to the loyalty of these two groups will do well to remain aloof from them, to demand that their names be taken off the registers, should they already have been entered there, and keep the copy as well as the postal receipt of mailing in a safe place.

"Harmless, loyal minded Austro-Americans are at the present time being requested under the guise of innocent pretexts, such as cultural gatherings or collection of restitution claims, to join the ranks of the Austro American Council and Austro American Tribune.

"For example: We have before us the following circular letter: 'New York, June 1948. Mr. * * * New York, N. Y. We have the honor to inform you that as a result of our efforts to secure the aid of a larger organization in pursuing Austrian restitution claims we have succeeded in winning the support of the Austro American Council. After thorough conferences in which Regierungsrat Dr. Herman Oppenheim, Dr. Victor Menschel and Jacob Herzig, secretary of the Austro American Council, took part, it was decided to begin the action under the aegis of the Austro American Council. We invite you to join the Council without delay and to get all of your acquaintances, interested, to join as well. Enclosed please find an application for membership which we ask you to fill out. Please send it with check or money order ($1.00) to Austro American Council, 13 West 106th Street, New York 25, NY. Very truly yours, Simon Jacob Wugen M. Hoffmann Fred Reiss (signed) F. Reiss.'

"For our readers' further information and so that they may judge for themselves we advise:

"Regierungsrat Herman Oppenheim is, according to the list before us, sponsor of the Austro American Council. Before that he was the vice President of Mr. Ferdinand Czernin who is known to favor the cession of the Kaerntner regions to Yugoslavia.

"Dr. Victor Menschel is Vice President and Jacob Herzig is Secretary of the Austro American Council.

"Dr. Franz Goldner, a former lawyer in Wiener Neustadt, is legal advisor to these groups.

"Furthermore we present the following for our readers to judge: In the July 1, 1948 issue of the Austro American Tribune we read as follows regarding the commencement of the prison terms of its founder and first president and of other functionaries of the merged association.

"'Among the ten board members of the joint Anti-Fascist Refugee Committee who were sentenced along with Howard Fast are Dr. Jacob Auslander, founder and first president of the Austro American Tribune, and Professor Lyman Bradley, member of our paper's Board. *The management of the Austro American Tribune is proud of its connection with these courageous men.*'

"Let it be understood. We do not intend to make converts. To the contrary. He who feels himself drawn in any way to these organizations should remain there. We are for clear differentiation. The purpose of these lines is exclusively to keep our readers, who are all loyal citizens, out of embarrassing situations   *   *   *.''

When complainant helped organize the council he acted on the recommendation of a Count Czernin whom he had known abroad. He knew few of the other organizers. He also became a member of the board of directors of the council, knowing little of the background or the political beliefs of his fellow officers. He freely admits having made no investigation or inquiry concerning them. Indeed, though he remained an officer of the council for four years, he neither met or now knows the main body of the officers of the council. He attended no more than three meetings, of any kind, during all those years. He did not inquire into the actual use of the funds of the council. While declining to state whether he "sponsored" the council, he does not deny his connection therewith until a few weeks prior to the date of the publication complained of. There were persons prominent in public life who were his fellow officers, but he did not get to meet or to know them. Believing the purposes of the council to be those of culture for its members,

assistance to Austrians abroad and pursuit of Austrian restitution claims, he never made any investigation of its actual purpose, activity or political work.

Defendant had been a member of the diplomatic corps in Austria and an adherent of the Democratic Socialist party there. Considering this background and in view of what he regarded to be his duty as a publisher, he felt impelled to keep his readers informed as to communist activity of certain groups. This he did regardless of the stated purposes or the prominence of the officers of such groups. The sources of his information, aside from his studies of political matters as a publisher all his life, were based on independent research, continual reading of many newspapers published here and abroad, particularly his daily reading of the anti-communist newspaper published in Austria known as the *Arbeiter-Zeitung*. Having made a study of the methods and personnel of pro-communist groups, he desired to instill caution into the minds of his unsuspecting readers. For example, he had noted that at least eight of the officers of the council and the newspaper '' *Austro American Tribune* '', a newspaper closely allied to the council, were also officers of some eleven organizations which were listed as subversive by the United States Attorney General — that the *Arbeiter Zeitung* had branded the council as a communist front — that the *Arbeiter Zeitung* informed the Austrian public that gift packages collected by the council for poor persons in Austria had been diverted to rich communists both in Austria and Yugoslavia — that the council favored ceding the province of Corinthia to Yugoslavia which was favored by communists and opposed by all the non-communist population in Austria — that one of the council officers had been the communist party lawyer in Austria — that some of the officers of the *Austro American Tribune* had been indicted and convicted of contempt of the Congressional Un-American Activities Committee.

On the basis of this study and knowledge, the defendant published the article above mentioned which forewarns his non-communist readers with respect to the council and the *Austro American Tribune*. On the basis of the facts therein recited it asks them to judge whether these organizations are communist and subversive. In it the complainant's connection with the council is distinctly stated. It is this statement of connection, though substantially true, that complainant claims spells out the inference that he is a communist, constituting a criminal libel.

It cannot be said that the criminal intent which is essential to a prosecution of criminal libel (*People ex rel. Carvalho* v.

*Warden,* 144 App. Div. 24, affd. 212 N. Y. 612) is present in the instant case. Defendant's motives were apparently good and the ends he sought justifiable to excuse his publication under the second paragraph of section 1342 of the Penal Law (*People* v. *Yui Kui Chu,* 273 N. Y. 191). The defendant showed circumstances from which a legal inference may be drawn that there were grounds for his belief that the publication was true and that he believed it to be true to excuse it under the third paragraph of that section (*People* v. *Sherlock,* 56 App. Div. 422, affd. 166 N. Y. 180). Since the complainant is a figure of prominence in respect to public affairs, the disclosure and explanation of his connection with the council, is certainly excusable under the same paragraph of the section.

An evil or malicious motive in such disclosure is claimed to have inspired the defendant because, some four years earlier, complainant had interfered with a proposed loan to defendant's paper. This fact is entirely remote in time and circumstance to spell out malice. There is some evidence of defendant's offer to clear complainant entirely provided complainant withdrew from the council. Though he had resigned some weeks prior to the publication, that fact was not publicized or brought to defendant's attention. Malice should be affirmatively established where a publication is excusable under section 1342 of the Penal Law (*People* v. *Hebberd,* 96 Misc. 617).

In these days of extreme and strained relations between this country and the Soviet Union, any American accused of being a communist is naturally suspected of infidelity to his country. To most Americans, the communist political philosophy represents a repressive and freedomless way of life. The American communist is subjected to real public contempt. A publisher should therefore exercise great care before naming a person a communist because, if untrue, it is per se libelous (*Mencher* v. *Chesley,* 297 N. Y. 94).

The complainant is not categorically named a communist in the publication. His connection with the council is truthfully set forth. No doubt the very mention of that connection, assuming that the facts recited have convinced some readers that the council is sympathetic to communism, gives the impression that complainant himself is a communist. This result, however, is of the complainant's own making. His failure to investigate and become acquainted with most of his fellow officers, his failure to inquire into the true activities of the council, his consent to the use of his name on the recommendation of a single individual, his meagre attendance at meetings of his

fellow board members — all point to an utter disregard for the consequences of his association with the council. May he now claim that the publication of that association exposed him to hatred, contempt and ridicule when he himself helped to accomplish that result?

The hearing Magistrate, even where he may but act in a committing capacity upon a charge of criminal libel, cannot ignore the complainant's self-exposure to public condemnation. Complainant may be one of those persons highly regarded in public life, who are too prone to lend their good names as officers of organizations whose true motives are neither investigated or carefully considered. Because of their very prominence they ought be most circumspect before associating themselves with politically active groups. Organizational use of an outstanding name, particularly if it be a popular and well spoken of name, may induce unsuspecting persons, relying thereon, to join groups they might otherwise reject.

The complainant, however much he may himself be opposed to communism, freely allowed his name to be used by the council and he may not now complain that the publication of that fact was libelous.

There is no showing of a violation of sections 1340 to 1344 of the Penal Law to warrant a holding of the defendant for the action of the grand jury. The information is dismissed and the defendant is discharged.